**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **BRENDA BUSBY,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:25-cv-00087-KD-MU** |
| | ) | |
| **ORKIN, LLC,** | ) | |
| **Defendant.** | ) | |

## <u>ORDER</u>

This action is before the Court on the Motion for Summary Judgment filed by Defendant Orkin, LLC ("Orkin"). (Docs. 18, 19).[1] Plaintiff Brenda Busby ("Busby") seeks to hold Orkin liable for termite damage to her home. Orkin moves for summary judgment as to all claims. In support, Orkin advances several legal theories for limiting its liability and the available damages. Upon consideration, and for the reasons below, the motion for summary judgment is **GRANTED in PART**.

### I.    FINDINGS OF FACT[2]

On March 8, 1972, Orkin entered into a contract (the "Contract") with Ralph Hughes ("Hughes") to provide termite services to his house (the "House"). (Doc. 17-1). Orkin's initial inspection of the House revealed pre-existing termite damage and an infestation of live subterranean termites that were swarming and in the ground. (Docs. 17-3 at 2 ("Graph"), 17-4 at 2). The inspection also revealed that the House had a "heavy" infestation of powder-post beetles and wood bores. (Doc. 17-4 at 2).

---

[1] Busby's counsel is reminded that all pleadings must contain 12-point or larger font. S.D. Ala. GenLR 5(a)(2). The response to the motion for summary judgment contains size 11-point font.

[2] The "facts," as accepted at the summary judgment stage, "may not be the actual facts of the case." <u>Feliciano v. City of Miami Beach</u>, 707 F.3d 1244, 1247 (11th Cir. 2013).

The Contract provided that Orkin would conduct an initial treatment and annual inspections, but the Contract contained limitations and conditions. (Doc. 17-1). Under the "General Terms and Conditions," the Contract states: "Orkin is not responsible for the repair of visible damage existing as of the date of this contract as such damage is described on the Graph and Specification Sheet and for which a specific charge for the repair of same is made." (Doc. 17-2 at 3). Under a section titled "Subterranean Termite Control Guaranty," the Contract states:

Subject to the general terms and conditions, Orkin will issue a control guaranty and, at no extra cost, apply any necessary additional treatment to the premises if reinfestation is found therein during the period of the guarantee. The purchaser further understands that Orkin's liability under this agreement is limited to retreat only and in no way, implied or otherwise, is responsible for damages or repairs to the structure or contents.

(Doc. 17-1 at 3).

In March 1972, Orkin conducted its initial treatment of the House for subterranean termites, and Orkin applied a spray powder for post beetles and wood borers. (Doc. 22-1 at 7). The initial treatment was $213, and the Contract allowed for annual renewals at $30. (Doc. 17-3 at 2). The Contract was renewed annually by Hughes until Busby purchased the House in 1997. (Doc. 22-2 at 3). From this time, Busby paid the annual renewals—although the contract was not formally transferred into her name and that of her ex-husband until 2001. (Id.).

Orkin also performed annual inspections of the House. Orkin usually issued inspection reports to the owner of the House at the time of the annual renewals. (Doc. 22-1 at 16–25, 31–50, 54, 64–64). Aside from the initial inspection graph, there is no record of any Orkin inspection report advising Busby of any new termite activity or damage. (Doc. 22-1; Doc. 22-5 at 6).

In July 2005, Orkin retreated the House with additional termiticide. (Doc. 17-2 at 15). This supplemental treatment was not required under the Contract. (Id.). Neither party disputes that this retreatment was a "voluntary undertaking" by Orkin. (Doc. 23 at 13).

In 2011, Orkin delegated the services for the House, including the annual inspections, to its local Orkin franchisee (Goodrow, Inc.). (Doc. 22-13 at 4). Orkin's customer file omits inspection reports for 2011, 2012, 2015, 2016, 2017, 2018, 2020, and 2021. (Doc. 22-1). In 2013, the inspection reports began to be generated in an electronic format and contained several statements. (Doc. 22-1 at 45). These reports state:

> You made a wise decision by selecting Orkin to help protect your home with our renewable protection plan. Thank you for reviewing your protection plan each year. The benefits of your continuous protection plan include this inspection. Orkin inspects and monitors your home to help maintain the effectiveness of your treatment plan.

(Doc. 22-1 at 45). These reports also state: "[I]t is probable that your home will experience future termite activity and damage, and treatment by Orkin may not solve the termite problem." (Id.).

The Contract did not require Orkin to provide details on the annual inspections. (Doc. 17-1). However, the inspection reports for 2019 and 2023 contain entries under the section titled "Services Provided." (Doc. 22-1 at 47, 48, 50). Two inspection reports indicate that Orkin inspected the interior, exterior, crawl space, and attic on December 7, 2019. (Doc. 22-1 at 47, 48).[3] Another inspection report indicates that Orkin inspected the interior, exterior, and crawl space on September 8, 2023. (Doc. 22-1 at 50). This 2023 inspection report was signed by the employee "Alex Spivey." (Id.).

In November 2023, the concrete slab top to Busby's front dirt-filled porch collapsed and cracked in two. (Doc. 22-1 at 53, 59, 62). An inspection report dated November 28, 2023, indicates that Alex Spivey ("Spivey") returned to the House and inspected the exterior. (Doc. 22-1 at 54). Spivey emailed an Orkin Branch Manager on November 27, 2023, regarding Busby's account. Spivey's email reads: "Damage to front porch. Evidence of termite damage around front porch.

---

[3] One of these 2019 reports indicates the following observations: "Crawl Vapo Needed," "Gutters Needed," "Bushes and or Trees Touching Bui," and "Excessive Moisture in Crawl." (Doc. 22-1 at 48). The status for each of these "Observations" states: "Customer Responsibility." (Id.).

Termites have compromised wood that supports the concrete causing porch to sink. Damage to wood appears old, did not see active termites. There's a crawl space entryway but it's to[o] small for me to access." (Doc. 22-1 at 51).

There is no evidence that Orkin ever failed to report live termite activity at the House while Busby owned it. However, an expert (John Fitzgerald) testified that from a structural standpoint, the primary cause of the collapse of the porch was severe termite damage to the rim joists supporting the slab. (Doc. 22-4 at 9). Another expert (Steve Rohal) opined that the termite damage in the House would have been visible from the crawl space with an inspection: "The widespread nature of the severe termite and other WDO damage within the crawlspace indicates that the crawlspace had not been inspected in years." (Doc. 22-3 at 9).

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome" of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a genuine dispute of material fact exists. Id.

The party moving for summary judgment "bears the initial burden of demonstrating the absence of a genuine dispute of material fact." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011). The movant meets this burden by identifying affirmative evidence (pleadings, depositions, answers to interrogatories, admissions on file, etc.) to support its claim that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A). If the nonmovant bears the burden of persuasion at trial, the movant may also make a prima facie showing of summary judgment by demonstrating that the

4

nonmovant's evidence is insufficient to establish an essential element of its claim. <u>Grange Mut. Cas. Co. v. Slaughter</u>, 958 F.3d 1050, 1057 (11th Cir. 2020); Fed. R. Civ. P. 56(c)(1)(B).

If the movant meets its burden under Rule 56(c), summary judgment will be granted unless the nonmovant offers some competent evidence that could be presented at trial showing that there is a genuine dispute of material fact. <u>Celotex</u>, 477 U.S. at 324. If the movant met its burden by pointing "to specific portions of the record . . . to demonstrate that the nonmoving party cannot meet its burden of proof at trial," the nonmovant must "go beyond the pleadings" to designate specific facts showing a genuine issue for trial. <u>Id.</u>; Fed. R. Civ. P. 56(e).

When assessing a summary judgment motion, the court's function is not to make "credibility determinations" and "weigh the evidence." <u>Anderson</u>, 477 U.S. at 248. Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." <u>FindWhat</u>, 658 F.3d at 1307. Thus, summary judgment is only proper when a movant shows that no reasonable jury could find for the nonmovant—even when the evidence and inferences are drawn in the nonmovant's favor.

### III.   ANALYSIS

Busby alleges six causes of action: (1) misrepresentation and concealment; (2) negligent supervision; (3) wanton supervision; (4) breach of contract; (5) negligence; and (6) wantonness. (Doc. 1-2).[4] Orkin moves for summary judgment as to all of Busby's claims, and Orkin moves to limit the available damages. (Doc. 19).

The Court addresses each of Orkin's arguments in turn. *First*, the Court addresses whether Busby's tort claims are barred as a matter of law. *Second*, the Court addresses the application of

---

[4] Busby "concedes that her claims for negligent and wanton failure to hire, train, and retain are due to be dismissed." (Doc. 21 at 1 n.1).

the rule of repose. *Third*, the Court addresses the breach-of-contract claim. *Fourth*, the Court addresses the available damages.

### A. Whether Busby's tort claims are barred as a matter of law

"The 'mere failure to perform a contractual obligation is not a tort, and it furnishes no foundation for an action on the case.'" Nucor Steel Tuscaloosa, Inc. v. Zurich Am. Ins. Co., 343 So. 3d 458, 475 (Ala. 2021) (quoting C & C Prods., Inc. v. Premier Indus. Corp., 275 So. 2d 124, 130 (Ala. 1972)). Here, the parties agree that this "long-standing maxim in Alabama's common-law," bars tort claims based on the mere failure to perform a contractual obligation. (Doc. 21 at 12). However, the parties disagree on the scope of this rule as it applies to Busby's claims. Orkin argues that Alabama's general rule forecloses all of Busby's tort causes of action (Counts One, Two, Three, Five, and Six). Busby argues that none of her tort claims are barred.

To resolve this preliminary dispute, the Court must distinguish between tort and contract obligations. This "line of distinction . . . is thin and often nebulous." Ex parte Certain Underwriters at Lloyd's of London, 815 So. 2d 558, 563 (Ala. 2001) (quoting Hamner v. Mut. of Omaha Ins. Co., 270 So. 2d 87, 90 (Ala. Civ. App. 1972)). The Alabama Supreme Court has summarized the line distinction between contract and tort claims as follows:

> There is, in Alabama, no tort liability for nonfeasance for failing to do what one has promised to do in the absence of a duty to act apart from the promise made. On the other hand, misfeasance, or negligent affirmative conduct in the performance of a promise generally subjects an actor to tort liability as well as contract liability for physical harm to persons and tangible things.

Morgan v. S. Cent. Bell Tel. Co., 466 So. 2d 107, 114 (Ala. 1985).

Accordingly, Alabama law provides courts with two inquiries for determining whether tort liability is present in a contractual relationship. *First*, are the tort claims based on a duty to act apart from the contract? If so, these claims are not barred because they are not based on a mere

failure to perform a contractual obligation. *Second*, are the tort claims, which arise from contractual duties, based on misfeasance or nonfeasance? If these claims are based on misfeasance, there is tort liability for physical harms to persons and tangible things. If these claims are based on nonfeasance, there is no tort liability.

Before answering these questions, it is helpful to distinguish between the questions themselves. In practice, the two questions can be conflated. In Morgan, the plaintiffs' suit was based on a contractual relationship with the defendants to place advertisements in the Yellow Pages, which was the only permanent form of advertising allowed for the plaintiffs' profession (dentistry). Id. at 110. Despite being aware of that dependency, the defendants failed to place one of the plaintiffs' names in the Yellow Pages four times in succession. Id. at 114. The plaintiffs sued for fraud, negligence, and breach of contract. The trial court held that the action for negligence was not supported by the facts. Id. The Alabama Supreme Court explained that the trial "court improperly characterized defendants' negligence in their performance of contracts entered into with the plaintiffs as *nonfeasance rather than misfeasance*." Id. at 114 (emphasis added). The Morgan Court explained:

> The rule which seems to have emerged from the decisions in the United States is that there will be liability in tort whenever misperformance involves a foreseeable, unreasonable risk of harm to the interests of the plaintiff or where there would be liability for performance without the contract. More simply stated, we must determine whether there is a legal duty sufficient to support an action for negligence. For that determination, three primary considerations are important: (1) the nature of the defendant's activity; (2) the relationship between the parties; and (3) the type of injury or harm threatened. [Prosser, supra] p. 655.

Id. (citing Prosser's Selected Topics in the Law of Torts p. 655 (1984)). Ultimately, the court concluded that the defendants were subject to tort liability even though their "relationship . . . was primarily a contractual one." Id. The reason was because the "plaintiffs were clearly dependent on the Yellow Pages as their only form of advertisement, [the] defendants were aware of that

dependency," the defendants performed the contract in "a negligent and slipshod manner," and "the type [of] injury and harm threatened" warranted tort liability. Id.

More recently, in Nucor Steel Tuscaloosa, Inc. v. Zurich Am. Ins. Co., 343 So. 3d 458, 475 (Ala. 2021), the Alabama Supreme Court analyzed whether the alleged tortious conduct was misfeasance or nonfeasance. The Nucor Court cited Morgan for its general rule that misfeasance requires affirmative conduct:

> The alleged failure to perform a duty to inspect does not amount to "*affirmative conduct* in the performance of a promise" under a contract. Morgan, 466 So. 2d at 114 (emphasis added). Misfeasance giving rise to tort liability under a contract requires the negligent doing of some act. Id. The alleged failure to perform an inspection is merely an omission or a failure to perform a promise under the [contract] and does not give rise to extracontractual liability . . . .

Nucor Steel, 343 So. 3d at 475.

In sum, Morgan's three primary considerations (and the question of foreseeability) are relevant to determining whether a defendant has a legal duty independent of the contract. Morgan's definition of misfeasance—negligent affirmative conduct—is relevant to determining whether a defendant is subject to tort liability when there is no duty apart from the contract.

Orkin's briefing only addresses the first question: whether the tort claims are based on a separate duty. Orkin's briefing does not mention "misfeasance" or "nonfeasance." Arguing that the tort claims are not based on a separate duty, Orkin cites several federal opinions from Alabama district courts that have "consistently followed that principle." (Doc. 19 at 12).

Orkin draws comparisons with another termite case: Sellew v. Terminix Int'l Co., LP, No. 2:17-CV-01926-RDP, 2020 WL 1083148, at *7 (N.D. Ala. Mar. 6, 2020). In Sellew, the plaintiff brought tort and contract claims against the defendant based on the defendant's alleged failures in treating termites. The defendant moved for partial summary judgment on several grounds, including the theory that the plaintiff's tort claims necessarily fail under Alabama law "because

they all are premised on contractual duties." Id. at *6. The court granted summary judgment on the negligence claims because those claims were based on "failures" to perform under the contract. Id. The court did not specifically characterize the "failures" as nonfeasance, but its citation to Locke v. Ozark City Bd. Of Educ., 910 So. 2d 1247 (2005), indicates that the court considered the alleged "failures" to be a nonperformance of a contractual term. However, it should be noted that the court denied summary judgment on one of the tort claims (fraudulent misrepresentation). Id. at *8.[5] On this issue, the court determined that the defendant's alleged assurances about the effectiveness of certain treatments could constitute fraudulent misrepresentation. Id. at *9.

Here, Orkin's argument is very similar to the defendant's argument in Sellew. "[T]he sole source of any duties owed by Orkin to Plaintiff is the 1972 Contract." (Doc. 19 at 11). "Just as in Sellew, Ms. Busby has sued her termite control company for an alleged failure to provide [termite services]. But none of these 'failures'—or any duty to perform them—would exist but for the contract between Plaintiff and Orkin." (Id. at 13–14). "In other words, if Ms. Busby did not have a contract with Orkin, Orkin would be under no obligation to perform these functions." (Id. at 14).

In response, Busby argues that Sellew departed from "clear Alabama case law allowing tort claims for the negligent performance of contractual duties that results in personal injury or damage to real property." (Doc. 21 at 16). The bulk of Busby's argument centers around the three considerations articulated in Morgan. For example, Busby argues that she, like the plaintiffs in Morgan, was "entirely dependent" upon Orkin for the services in question. (Doc. 21 at 13). Busby argues that the damage to her property was "highly foreseeable and likely." (Id.). And Busby argues that the nature of the relationship between her and Orkin is "unequal." (Id.). In sum, Busby

---

[5] The Court reviewed the docket in Sellew, including the amended complaint, the motion for summary judgment, and the response. (N.D. Ala. Case No. 2:17-cv-01926-RDP; Docs. 10, 54, 55). The defendant in Sellew argued that the fraudulent misrepresentation should be dismissed because the source of that duty was the contract. (Id.; Doc. 54 at 13–14).

argues that "the relationship of the parties, the disparity in knowledge, the unequal bargaining power, the common law duties to act reasonably to prevent harm, and the foreseeability of the damages" subject Orkin to tort liability. (Doc. 21 at 15).

Here, Busby brings five tort claims: (1) fraudulent misrepresentation and concealment; (2) negligent supervision; (3) wanton supervision; (4) negligence; and (5) wantonness. All claims relate, at least in part, to the termite treatment contract with Orkin. In other words, "[t]he relationship between [the parties] was primarily a contractual one." Morgan, 466 So. 24 at 114.

### 1. Misrepresentation and concealment

Busby's misrepresentation claim is based on the theory that "Orkin fraudulently misrepresented to the Plaintiff that it had provided the liquid termiticide treatment necessary to protect her Home . . . ." (Doc. 1-2 at 18). Busby's concealment claim is based on the theory that Orkin concealed: 1) that Orkin had never provided her home with a continuous termiticide barrier treatment; 2) that there was severe and widespread termite damage within her crawl space; 3) that Orkin had not been inspecting the crawlspace.  (Doc. 21 at 22). In sum, both claims are based on the failure to inform Busby of material facts related to the condition of her house as it concerned protection from termites.

The Court finds that Orkin had an extracontractual duty to inform Busby of the necessary facts to allow her to make decisions concerning the continuation of the termite policy each year. In other words, by soliciting Busby's business on an annual basis, Orkin was required to provide complete and accurate information to Busby. This duty sounds in tort and is separate from any breach of contract claim.[6] See Exxon Mobil Corp. v. Alabama Dep't of Conservation & Nat. Res., 986 So.

---

[6] In Busby's brief she argues promissory fraud. There is no separate claim for promissory fraud in the complaint. In the claim for misrepresentation and suppression, Busby alleges that Orkin fraudulently misrepresented that it would provide retreatments necessary to protect the Plaintiff's Home. To the extent the Court could credit this as a claim of promissory fraud, such claim fails.

2d 1093, 1129 (Ala. 2007) (Lyons, J., concurring in part and concurring in result) (noting the "long-standing rule" that "[a] party who has been the victim of a misrepresentation of a material fact or the suppression of a material fact when there is a duty to speak upon which it reasonably relied *during negotiations* can claim fraud in the inducement"). "[T]he aggrieved party, in effect, says, 'I would never have entered into the contract if you had not induced me to do so by incorrect statements or omissions of material facts.'" Id.

As explained in NTA Graphics S., Inc. v. Axiom Impressions, LLC, 413 F. Supp. 3d 1164, 1178 (N.D. Ala. 2019), "[w]hat is required for the simultaneous prosecution of such claims is that 'the fraud claim [ ] be based on representations independent from promises in the contract and [that it] independently satisfy the elements of fraud.'" (quoting Hunt Petroleum Corp. v. State, 901 So. 2d 1, 10-11 (Ala. 2004) (Houston, J., concurring specially)).

> The elements of a fraudulent misrepresentation claim are (1) a false representation (2) of existing material fact (3) relied on by the plaintiff, (4) who was damaged as a proximate result of the misrepresentation. Baker, 661 So. 2d at 1157. The elements of a fraudulent suppression claim are (1) the concealment of an existing material fact, (2) which the defendant had a duty to disclose, (3) and which induced the plaintiff to act or refrain from acting, (4) as a proximate result of which the plaintiff was damaged. Coilplus-Alabama, 53 So. 3d at 909. While a fraudulent misrepresentation claim does not require knowledge by the defendant of the falsity of its representation, In re Bennitt, 348 B.R. 820, 826 (Bankr. N.D. Ala. 2006) (citing First Nat'l Bank of Auburn v. Dowdell, 275 Ala. 622, 157 So. 2d 221, 225 (1963); Barrett v. Hanks, 275 Ala. 383, 155 So. 2d 339, 342 (1963)), a fraudulent suppression claim requires proof the defendant actually knew the fact alleged to have been suppressed, Coilplus-Alabama, 53 So. 3d at 909 (citing Cook's Pest Control, Inc. v. Rebar, 28 So. 3d 716, 726 (Ala. 2009)). Fraudulent inducement is a species of fraudulent misrepresentation or suppression where a party relies on a false representation or omission made during negotiations in executing an agreement or taking a course of action. See Oakwood Mobile Homes, Inc. v. Barger, 773 So. 2d 454, 459 (Ala. 2000) (defining fraud in the inducement).

---

The failure to provide the retreatments as promised in the contract is an act of nonfeasance and does not give rise to extracontractual liability. Moreover, there are no facts alleged that Orkin intended to deceive Busby when the promise to retreat was made.

NTA Graphics, 413 Supp. 3d at 1179–80. The Court finds that there are issues of fact as to whether Orkin misrepresented or concealed material facts to induce Busby to continue renewing her termite agreement with Orkin. Accordingly, summary judgment is **DENIED** as to the claims of fraudulent misrepresentation and concealment (Count One).

### 2. Negligent and wanton conduct

Busby's negligent and wanton supervision claims are based on the theory that Orkin failed to ensure that its employees reasonably performed its contractual services for Busby's home, specifically the inspections. (Doc. 21 at 26). And Busby's negligence and wantonness claims are based on the theory that Orkin "failed to provide said structural termite prevention and control services to the Plaintiff in a reasonable and workmanlike manner." (Doc. 1-2 at 21–22). All of these claims relate directly to the services promised in the contract. And despite using the terms "reasonable" or "reasonably" in describing the failure to inspect, the gravamen of the complaint is that Orkin failed to either inspect certain areas, or if it did inspect Orkin failed to retreat as promised. Both alleged "failures" are contractual. "The alleged failure to perform a duty to inspect does not amount to "*affirmative conduct* in the performance of a promise" under a contract." Nucor, 343 So. 3d at 475. Failure to perform as promised is nonfeasance and does not give rise to extra-contractual liability. Accordingly, Orkin's motion for summary judgment as to negligent and wanton conduct (Counts Two, Three, Five and Six) is **GRANTED**.

### B. Whether the rule of repose applies

"Alabama's judicially created rule of repose serves to bar claims that arise out of events that are more than twenty years old." Moore v. Liberty Nat. Life Ins. Co., 267 F.3d 1209, 1213 (11th Cir. 2001). The rule of repose—not to be confused with a statute of repose—is derived from common law. Early Alabama court decisions "suggested an occurrence-based application of the

rule." Jill E. Evans, The Rule of Repose: Charting Its Course Through Alabama Law, 40 Am. J. Trial Advoc. 263, 291 (2016). "[T]he inquiry into whether the repose period had run was clearly focused on conduct by the defendant." Id. at 292. "Accrual of the claim had no bearing on whether the repose period had been triggered." Id. at 291–92.

"In recent years, however, Alabama courts have struggled with understanding the parameters of the rule of repose and when and how it is—or should be—triggered." Id. at 292. This struggle "seems to have been set in motion with the Alabama Supreme Court's decision in Boshell v. Keith." Id. at 292. In Boshell, the Alabama Supreme Court articulated the basic principles of the rule of repose:

> This principle of repose or prescription is similar to a statute of limitations, but not dependent upon one, and broader in scope. Scott v. Scott, 202 Ala. 244, 80 So. 82 (1918); Patterson v. Weaver, 216 Ala. 686, 114 So. 301 (1927). It is a doctrine that operates in addition to laches. Unlike laches, however, the only element of the rule of repose is time. It is not affected by the circumstances of the situation, by personal disabilities, or by whether prejudice has resulted or evidence obscured. Wilkerson v. Wilkerson, 230 Ala. 567, 161 So. 820 (1935); 30A C.J.S., Equity § 113 (1965), at p. 33. It operates as an absolute bar to claims that are unasserted for 20 years. Roach v. Cox, 160 Ala. 425, 49 So. 578 (1909).

Boshell v. Keith, 418 So. 2d 89, 91 (Ala. 1982). After articulating these principles, the court distinguished between the statutory rule of repose, which had recently been struck down as unconstitutional, and the common law rule of repose. Id. at 92. The court reasoned that the "common law rule is couched in terms of the 'running of the period against *claims*.'" Id. The statutory rule, on the other hand, began to run "from some arbitrary date unrelated in point of time to the accrual of a cause of action or the prior existence of a viable and cognizable claim." Id. Ultimately, the Boshell Court concluded that the "common law rule [of repose] is premised upon the pre-existing right to assert a claim." Id.

13

Since <u>Boshell</u>, courts have been left with competing theories. <u>See</u> <u>Collins v. Scenic Homes, Inc.</u>, 38 So. 3d 28, 36 (Ala. 2009) (Murdock, J., dissenting) ("I find our decisions on this issue conflicted and confusing."). On the one hand, the only element of the rule of repose is time. On the other hand, the rule of repose does not begin to run until a claim exists. Ultimately, the Alabama Supreme Court has decided that the "common-law rule of repose does not begin to run on a claim until all the essential elements of that claim, including an injury, coexist so that the plaintiff could validly file an action." <u>Owens-Illinois, Inc. v. Wells</u>, 50 So. 3d 413, 417 (Ala. 2010). In other words, "the rule of repose does not depend solely on the actions of the defendant." <u>Id.</u>

The Alabama Supreme Court has also expressly stated that the twenty-year period may begin to run at different times for different claims. For example, "[a] suit on a tort claim may not be commenced until the defendant's tortious act proximately causes the plaintiff to suffer an actual injury." <u>Am. Gen. Life & Acc. Ins. Co. v. Underwood</u>, 886 So. 2d 807, 812–13 (Ala. 2004). That is because damages are an essential element of a tort claim. "A suit on a breach-of-contract claim, on the other hand, may be commenced as soon as the defendant breaches the contract, regardless of whether the plaintiff has suffered an actual injury." <u>Id.</u> at 813 n.1.

Orkin argues that Alabama's rule of repose "dictates that any of Plaintiff's claims premised on conduct from January 31, 2005 (*i.e.*, twenty years before suit was filed) or earlier are barred under the common law rule of repose." (Doc. 19 at 16).[7] Orkin is partially correct. Alabama's rule of repose bars any claim for *breach of contract* arising from Orkin's conduct before January 31, 2005. The simple reason is that a breach-of-contract action based on this conduct could have been commenced as soon as these alleged breaches occurred. However, Orkin fails to convince this

---

[7] On reply, Orkin argues that "Plaintiff's opposition wholly ignores this binding legal doctrine." (Doc. 7 at 23). Although Busby's response ignores the rule of repose argument, Orkin's motion and reply ignore the Alabama Supreme Court's express statements indicating that the rule of repose does not begin to run until all the elements of the claim coexist.

14

Court that the rule of repose bars Busby's tort claims premised on conduct that occurred before January 31, 2005. This determination is fact intensive and cannot be determined based on the record before this Court.

### C. The breach-of-contract claim

In Count Four, Busby alleges that Orkin failed to perform its contractual duties. "The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." Dupree v. PeoplesSouth Bank, 308 So. 3d 484, 490 (Ala. 2020) (quoting Shaffer v. Regions Fin. Corp., 29 So. 3d 872, 880 (Ala. 2009)).

Orkin contends that Busby's breach-of-contract claim fails for several reasons. *First*, Orkin argues that the contractual promise was limited to retreating the home only if termite "reinfestation is found." (Doc. 19 at 14). *Second*, Orkin argues that Busby has no evidence that a breach occurred within the rule of repose. (Id. at 17). *Third*, Orkin argues that Busby cannot recover related to alleged deficiencies related to services provide to the prior homeowner. (Id. at 18). *Fourth*, Orkin argues that Busby's theory rests on unsupported inferences in the treatment history. (Id. at 20). On this point, Orkin argues that Busby fails to show that Orkin caused the damage to worsen by (1) observing a termite reinfestation and failing to retreat or (2) failing to inspect the home. (Id. at 20).

In response, Busby argues that Orkin breached its contractual promise to "protect against subterranean termite infestations." (Doc. 21 at 27). According to Busby, Orkin's breaches occurred: (1) when Orkin failed to perform all of the activities required in the initial treatment, (2) when Orkin failed to ensure the home was inspected for several years after 2011, and (3) when Orkin failed to ensure that the inspections which were performed were done in a reasonable manner

consistent with industry standards. (Doc. 21 at 27). In reply, Orkin argues that the contract plainly limits Orkin's obligations to retreatment only if reinfestation is found. (Doc. 23 at 5).

### 1. What the contract required of Orkin

The first issue is to determine what the contract required of Orkin related to subterranean termite control. Orkin argues that the contractual promises to Busby were "limited and straightforward: 1) apply additional termiticide in the event future reinfestation was identified at the home; and 2) to inspect the property annually for termite activity." (Doc. 19 at 14) (citing Doc. 17-1). In support, Orkin argues that contract terms should be given their ordinary meaning and that terms should be construed to give effect to all terms used. (Doc. 23 at 5) (citing Vesta Fire Ins. Corp. v. Liberty Nat. Life Ins. Co., 893 So. 2d 395, 405 (Ala. Civ. App. 2003)). Busby argues that Orkin's contract entailed a broader promise "to protect [the home] against subterranean termite infestations." (Doc. 21 at 27).

"Whether a contract is ambiguous is a question of law to be determined by the court." Allied-Bruce Terminix Companies, Inc. v. Dobson, 684 So. 2d 102, 110 (Ala. 1995). Under the contract, Orkin agreed (1) to provide an initial treatment, (2) to annually inspect the home, and (3) to retreat the property if reinfestation was found. (Doc. 17-1). The relevant provision on retreatment reads: "**Subterranean Termite Control Guaranty** . . . Subject to the general terms and conditions, Orkin will issue a control guaranty and, at no extra cost, apply any necessary additional treatment to the premises *if reinfestation is found* therein during the period of the guarantee." (Id. at 3) (emphasis added). These contractual requirements are unambiguous, and Busby cites no law or evidence showing that Orkin contractually promised more.

To the extent that Busby interprets the phrase "continuous protection" in the contract and the annual inspections to be Orkin's promise a warranty against termite infestation, that understanding

16

is flawed. "When interpreting a contract, this Court will reconcile and enforce all of its terms and will not ignore or disregard any term so long as doing so is not patently unreasonable." Dickinson v. Land Devs. Const. Co., 882 So. 2d 291, 301 (Ala. 2003). Busby's interpretation ignores the "Subterranean Termite Control Guaranty" provision, which governs Orkin's duties "if reinfestation is found." (Doc. 17-1 at 3). Clearly, the contract contemplated potential reinfestation. Further, the annual inspection reports expressly stated: "[I]t is probable that your home will experience future termite activity and damage, and treatment by Orkin may not solve the termite problem." (Doc. 22-1 at 45). Finally, Busby offers no caselaw suggesting that this "retreatment only" provision is unreasonable. Cf. Cook's Pest Control, Inc. v. Rebar, 28 So. 3d 716, 719 (Ala. 2009) ("This contract was a 're-treatment-only' contract, which provided that Cook's would inspect the property for termites annually and would re-treat the property if termites were found.").

In short, "[t]he intention of the parties controls in construing a written contract, and the intention of the parties is to be derived from the contract itself, where the language is plain and unambiguous." Loerch v. Nat'l Bank of Com. of Birmingham, 624 So. 2d 552, 553 (Ala. 1993). Here, the intent of the parties was clear. Orkin contracted to provide an initial treatment, to annually inspect the home, and to retreat the property if reinfestation of subterranean termites was found.

## 2. Whether a reasonable jury could find that Orkin breached the contract

The next issue to resolve is whether a reasonable jury could find that Orkin breached a contractual promise. As a reminder, the rule of repose bars breach-of-contract claims based on conduct before January 31, 2005. Thus, the only basis for contractual liability against Orkin relates to conduct on or after January 31, 2005, involving: (1) Orkin's promise to provide annual inspections or (2) Orkin's promise to retreat if reinfestation is found.

17

Busby makes two arguments for a breach of contract based on the annual inspection. *First*, Busby argues that "the customer file clearly shows that Orkin . . . failed to ensure that the home was inspected for several years after 2011." (Doc. 21 at 27). *Second*, Busby argues that Orkin "failed to ensure that the inspections which were performed were done in a reasonable manner consistent with industry standards." (Id.). These arguments have support in the record. To start, Busby contends that "Orkin's customer file does not have any inspection reports for 2020 and 2021." (Doc. 21 at 9) (citing Docs. 21-1, 21-12). Further, Spivey's inspection report a few months before the collapse represented that he inspected the crawl space. Yet shortly after the collapse, Spivey emailed an Orkin representative indicating he could not fit part of the crawl space. Orkin makes no attempt to justify the omitted inspections or Spivey's conduct related to the crawl space. Viewing this evidence in the light most favorable to Busby, a reasonable jury could find that Orkin failed to fully perform the inspections.

The failure to retreat argument is more speculative because Busby presents no direct evidence that Orkin found reinfestation. However, Busby's expert found widespread termite damage and termite activity throughout the home's crawl space. (Doc. 22-3 at 9). "The widespread nature of the severe termite . . . damage within the crawlspace indicates that the crawlspace had not been inspected in years." (Id.). However, Orkin's annual inspection reports indicate that the crawl space was inspected just three months prior to the collapse. Assuming both the expert report and Orkin's report are true, and viewing the evidence in a light most favorable to Busby, a reasonable jury could infer that Orkin found reinfestation and failed to retreat.

To recap, the contract required Orkin (1) to provide an initial treatment, (2) to annually inspect the House, and (3) to retreat the property if reinfestation was found. Orkin cannot face contract liability for any conduct prior to January 31, 2005, including the initial treatment. But Busby's

18

breach-of-contract claims survives summary judgment based on the requirements to annually inspect the House and to retreat if reinfestation is found.

### D. Damages

The parties dispute the scope of the available damages. Orkin contends that Busby is not entitled to damages of any kind. Busby argues that she is entitled to all forms of damages alleged in the complaint. The Court addresses each in turn.

### 1. Repair costs

Orkin argues that Busby is not entitled to repair costs. This is based on Orkin's understanding of the contract, which expressly disclaims Orkin's liability for damages or repairs to the structure or contents. (Doc. 17-1 at 3). In response, Busby argues that the contractual limitation of liability is unenforceable because it is unconscionable. (Doc. 21 at 28). Busby contends that this is an adhesion contract and that the limitation provision would "substantively deny her any remedy whatsoever for the damage." (Id.). In reply, Orkin argues that "the contract provides a meaningful remedy: retreat at no additional cost if reinfestation is discovered." (Doc. 23 at 15).

"While it is true that a court may rescind a contract, or a portion of a contract, for unconscionability, '[r]escission of a contract for unconscionability is an extraordinary remedy usually reserved for the protection of the unsophisticated and uneducated.'" Layne v. Garner, 612 So. 2d 404, 408 (Ala. 1992) (quoting Marshall v. Mercury Finance Co., 550 So. 2d 1026, 1028 (Ala. Civ. App. 1989)). The test for determining unconscionability is "comprised of two essential elements: (1) terms that are grossly favorable to a party that has (2) overwhelming bargaining power." Am. Gen. Fin., Inc. v. Branch, 793 So. 2d 738, 748 (Ala. 2000). Here, Busby fails to show how enforcing the contractual limit would be unconscionable. The contract was not grossly favorable to Orkin. The terms provided an initial cost of $213 and an annual renewal fee of $30,

19

and Orkin was required to make inspections and to retreat the home at no additional cost if reinfestation was discovered.

Furthermore, enforcing the contractual limit of damages would not leave Busby without remedy for the damage. The relevant provision states: "The purchaser further understands that Orkin's liability under this agreement is limited to retreatment only and in no way, implied or otherwise, is responsible for damages or repairs to the structure or contents." (Doc. 17-1 at 3). The contract does not, nor could it, limit damages for fraud. See generally Willoughby Roofing & Supply Co. v. Kajima Int'l, Inc., 776 F.2d 269, 270 (11th Cir. 1985) (explaining that a contract provision that expressly limited remedies for breach of contract did not limit remedies for fraud). Orkin may be subject to liability for damages or repairs to the structure of contents if fraud is proven. Accordingly, Orkin is entitled to partial summary judgment on the availability repair costs as damages as it relates to the breach-of-contract claim.

### 2. Punitive damages

Orkin argues that Busby is not entitled to punitive damages. This is based on the requirement that punitive damages require proof of "clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." Ala. Code § 6-11-20(a). Orkin argues that there is insufficient evidence to meet this standard for the fraud and wantonness claims. Orkin also argues that "punitive damages are not recoverable for breach of contract." (Doc. 19 at 24) (quoting Geohagan v. Gen. Motors Corp., 279 So. 2d 436, 438 (Ala. 1973)). In response, Busby argues that it is premature for the court to address the availability of punitive damages assuming the court does not grant summary judgment on the fraud and wantonness claims. (Doc. 21 at 29).

20

Here, Orkin effectively shows that Busby is not entitled to punitive damages under the breach-of-contract claim, and Busby's response does not contest this issue. However, punitive damages on fraud claims may be available. The question is "whether there was evidence of such quality and weight that a jury of reasonable and fair-minded persons could find by clear and convincing evidence that the defendant consciously or deliberately engaged in fraud." <u>Ex parte Norwood Hodges Motor Co., Inc.</u>, 680 So. 2d 245, 249 (Ala. 1996). The Court carries this issue to trial; therefore, the motion for summary judgment is **DENIED** at this time.

### 3. Litigation fees or costs

Orkin argues that Busby is not entitled to litigation fees or costs. This is based on the "American rule" that each litigant bears its own fees and costs. <u>Reynolds v. First Alabama Bank of Montgomery, N.A.</u>, 471 So. 2d 1238, 1240 (Ala. 1985). In response, Busby argues that Alabama recognizes an equitable exception to this rule when the plaintiff prevails on claims of "fraud, willful negligence or malice." (Doc. 21 at 30) (quoting <u>Reynolds</u>, 471 So. 2d at 1243).

The "nature of the litigation" in <u>Reynolds</u> (beneficiaries suing their paid trustee in "essentially an equitable proceeding") was very different than the nature of the litigation of this case. <u>Reynolds</u>, 471 So. 2d at 1241. However, Orkin's reply does not address the stated exception for fraud.  This issue is carried to trial; therefore, the motion for summary judgment is **DENIED** at this time.

### 4. Equitable relief

Orkin argues that Busby is not entitled to equitable relief. This is based on the "general rule . . . that a court of equity will not take jurisdiction, if there is a clear, adequate and complete remedy at law." <u>Youngblood v. Youngblood</u>, 54 Ala. 486, 487 (1875). In response, Busby argues that "the Court's decision whether to exercise its inherent equitable powers is not a proper subject of a

motion for summary judgment, where the court makes rulings on the basis of the facts and law, and not on matters of discretion by the Court." (Doc. 21 at 30). Busby cites no law in support.

Contrary to Busby's argument, "numerous federal courts have granted summary judgment in proceedings seeking . . . equitable relief." 10B Wright & Miller's Federal Practice & Procedure § 2731 (4th ed. 2026). "[I]f there are no triable fact issues and the court believes equitable relief is warranted, it is fully empowered to grant it on a Rule 56 motion." Id. For example, in United States v. Gilbert, 920 F.2d 878, 880 (11th Cir. 1991), the Eleventh Circuit explained that it was proper for the district court to grant summary judgment in favor of the plaintiff on the issue of injunctive relief. "Conversely, of course, the court always is free to direct the entry of summary judgment for defendant when there are no genuine disputes of material fact and the court is unwilling to award plaintiff discretionary relief." Wright & Miller, supra at § 2731. Here, there is no genuine dispute of material fact on the issue of equitable relief. The general rule is that equitable relief is not available unless the remedy at law, such as monetary damages, is inadequate. Busby makes no argument that monetary damages would be an inadequate remedy. Therefore, Orkin is entitled to summary judgment on the issue of Busby's entitlement to equitable relief.

## IV.   CONCLUSION

Orkin moves for summary judgment as to all of Busby's claims, and Orkin moves to limit the available damages and Busby's entitlement to equitable relief.  Orkin shows that it is entitled to summary judgment, in part. Accordingly, it is **ORDERED** as follows:

- To the extent that Orkin argues that Busby's tort claims are barred as a matter of law, Orkin's motion is **GRANTED in part and DENIED in part**.

  o On Count One alleging misrepresentation and concealment, summary judgment is **GRANTED in PART** on the theory of promissory fraud. However, Count One survives under the theories of fraudulent misrepresentation and fraudulent suppression.
  o On Counts Two, Three, Five and Six alleging negligent/wanton supervision and negligence/wantonness, summary judgment is **GRANTED**.

22

- To the extent that Orkin argues that the rule of repose applies, Orkin's motion is **GRANTED in PART**. The rule of repose bars conduct before January 31, 2005, from forming the basis of the breach-of-contract claim only.

- On Count Four alleging breach of contract, summary judgment is **GRANTED in PART**, to the extent Busby seeks to hold Orkin liable for conduct prior to January 31, 2005.

- Regarding the availability of damages:

  o On the issue of repair costs, summary judgment is **GRANTED in PART**, to the extent that Busby seeks repair costs under the breach-of-contract claim.

  o On the issue of punitive damages, summary judgment is **DENIED**.

  o On the issue of litigation fees or costs, summary judgment is **DENIED**.

  o On the issue of entitlement to equitable relief, summary judgment is **GRANTED**.

**DONE** and **ORDERED** this **12th** day of **May 2026.**

 /s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**